Edward Eagan and Mary Eagan v. Commissioner. Leo T. Eagan and Eleanor D. Eagan v. Commissioner.
Eagan v. Commissioner
Docket Nos. 33827, 33931.
United States Tax Court
1953 Tax Ct. Memo LEXIS 162; 12 T.C.M. (CCH) 876; T.C.M. (RIA) 53266; July 31, 1953
Benjamin E. Shove, Esq., 800 Hills Building, Syracuse, N. Y., for the petitioners. Clay C. Holmes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income taxes for the year 1947 against petitioners as follows: Docket No. 33827
$49,716.73
Docket No. 33931
48,173.52 The proceedings were consolidated for trial. The sole issue is whether petitioners realized taxable income in 1947 by acquiring from City Investing Company for $23,100 Onondaga Holding Corporation and Salina Holding Corporation stock having a total par value of $110,400. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found. Edward Eagan *163 and Leo T. Eagan (hereinafter sometimes referred to as petitioners) are brothers living in Syracuse, New York. With their respective wives they each filed a joint return on a cash basis for the calendar year 1947 with the collector of internal revenue for the twenty-first district of New York. Since 1920 petitioners have been in the real estate business under the partnership name of Eagan Real Estate (hereinafter referred to as the Eagan partnership). For many years they have also been the sole stockholders of Eagan Real Estate, Inc. (hereinafter sometimes referred to as the Eagan corporation), Leo T. Eagan being president and Edward Eagan being vicepresident and treasurer. The offices of both the partnership and the corporation were in the same suite of rooms. Two sets of books were kept, one for the corporation and one for the partnership, but the same people took care of both sets. For several years petitioners have been the leading real estate brokers in Syracuse. Generally speaking, if a transaction was handled by either one of petitioners it was done through the partnership and if one of the sales organization handled a transaction it was done through the corporation. During *164 1947 the corporation also managed 56 different properties in Syracuse. It employed about 75 people in its main offices and about 250 people in the buildings it managed. City Investing Company, a New York corporation, (hereinafter called "City Investing") is engaged in the business of investing in real estate, directly and through subsidiaries. Its properties were located very largely in New York City until 1945 when it expanded its field of operations to include properties outside of that city. Its securities are listed on the New York Stock Exchange. Among the properties in Syracuse which the Eagan corporation managed in 1946 were a twelve-story office and store building called the Chimes Building and a seven-story office, store and theatre building called the Empire Building. Edward Eagan and Leo T. Eagan each owned a one-eighth interest in each of these buildings. Three other men in Syracuse each owned a one-quarter interest. Sometime in 1946 Leo T. Eagan brought the Chimes Building property to the attention of City Investing. On August 1, 1946, the owners, through the efforts of the Eagan partnership, sold the Chimes Building to City Investing for $1,870,000. By special *165 agreement with the three other co-owners, the Eagan partnership's commission was limited to $17,500 and was paid by such other co-owners. Sometime in January 1947, Leo T. Eagan brought the Empire Building property to the attention of City Investing and on February 1, 1947, the owners, through the efforts of the Eagan partnership, sold it to City Investing for $650,000. Pursuant to a special contract between the Eagan partnership and City Investing, City Investing paid the partnership $25,000 as commission on the sale. This amount was slightly more than the commission accorded by the Syracuse Real Estate Board schedule of commissions on the share of the Eagans' three co-owners on such a sale. In accordance with its established custom, City Investing caused to be organized under the laws of the State of New York the Onondaga Holding Corporation, hereinafter called "Onondaga," to receive and hold title to the Chimes Building property, and the Salina Holding Corporation, hereinafter called "Salina," to receive and hold title to the Empire Building property. The officers of City Investing were almost entirely the same as the officers of Onondaga and Salina. Neither Onondaga nor Salina *166 had any separate office space apart from the offices of City Investing. While a separate set of books was kept for each corporation, no one set of employees continuously worked on the books of any one corporation. On December 3, 1946 Onondaga leased a good portion of the Chimes Building to the United States of America. Such lease was to commence as to each floor when the space was made available to the United States. After City Investing had purchased the Chimes and Empire buildings, the Eagan corporation continued to manage them. On March 28, 1947, the Eagan corporation entered into written management contracts with Onondaga and Salina for the Chimes and Empire buildings, respectively. Both contracts were in the form regularly used by the Eagan corporation and included a provision allowing either party to cancel the agreement as of the last day of any month by giving 30 days prior written notice. The rates of commission charged were the regular and usual rates except for a reduction in the management fee for the Chimes Building when the United States took over full operation of that building. City Investing wanted the Eagan organization to handle its Syracuse properties because *167 most of City Investing's activities were in New York City, because the Eagans had a very large staff and had done good work in Syracuse and because the Eagans had originally interested City Investing in purchasing the properties. In November 1946, City Investing approached petitioners about buying some stock of Onondaga. At this time, petitioners told City Investing that they were not interested. Negotiations continued for several months and the price at which the stock was first offered was reduced. City Investing told petitioners that it thought petitioners would take a greater interest in the management and care of the Chimes Building if they had a proprietary interest. Throughout the negotiations City Investing asked for some sort of option-to-repurchase agreement. Sometime in March or April 1947 City Investing began negotiations with petitioners relative to their acquiring some stock of Salina on the same basis. Because City Investing seemed very interested in having petitioners buy some of the Salina and Onondaga stock, petitioners concluded that it would be a good thing for them to do. On April 17, 1947 the issued and outstanding shares of Onondaga were as follows: *168 564 shares of First Preferred Stock of par value of $100 each; 2,584 shares of Second Preferred Stock of par value of $100 each; 1,000 shares of Common Stock without par value On April 17, 1947 City Investing sold to each petitioner (Edward Eagan and Leo T. Eagan) 282 shares of First Preferred Stock, 144 shares of Second Preferred Stock and 50 shares of Common Stock for the sum of $8,800. These shares were sold and received subject to an agreement with each petitioner providing City Investing with a 90-day option to repurchase all of the shares in the event of petitioner's death or in the event he should desire to sell any of his shares. Prior to the above sale, all of the outstanding stock of Onondaga was owned by City Investing, which had paid $100 a share for the First and Second Preferred Stock and $1.00 a share for the Common Stock. On April 25, 1947 the issued and outstanding stock of Salina was 2,500 shares of Preferred Stock of a par value of $100 each and 1,000 shares of Common Stock without par value. On that day, City Investing sold to each petitioner, subject to an identical repurchase agreement, 125 shares of Preferred Stock of Salina and 50 shares of Common Stock *169 for the sum of $2,750. Prior to this sale, all of Salina's outstanding stock was owned by City Investing which had paid $100 per share for the Preferred Stock and $1.00 per share for the Common Stock. The acquisition of stock by petitioners in Onondaga and Salina was an isolated transaction. They had never acquired other stock under similar circumstances. City Investing would not, as a purely business policy, have sold the Onondaga and Salina stock at a discount to anybody who wanted to buy it. It sold the stock to petitioners because it was desirous of obtaining the unique abilities of the Eagan organization in Syracuse, believing that its own interest would be advanced and promoted if petitioners had an interest in the properties. Under the management of the Eagan corporation the Chimes and Empire buildings proved profitable to Onondaga and Salina, respectively. The annual gross income from the Empire Building was increased from approximately $92,000 per year to approximately $164,800 per year, and the Eagan corporation pursuant to its management contract received substantial leasing commissions and management fees during the period of its management. With respect to the Chimes *170 building, it received a small amount of leasing commissions and substantial management fees pursuant to its contract with Onondaga. On February 5, 1948, the Eagan partnership procured for Salina a $750,000 mortgage on the Empire Building and received from Salina a $15,000 commission which was the regular 2 per cent rate of the Syracuse Real Estate Board's commission schedule. On September 26, 1950, the Eagan partnership sold the Empire Building for Salina to a third party for $1,200,000 and received from Salina a $60,000 commission which was the regular 5 per cent rate of the Syracuse Real Estate Board's commission schedule. On October 26, 1947 the Eagan partnership procured a $1,650,000 mortgage on the Chimes building for Onondaga and received from Onondaga a $33,000 commission which likewise was at the regular rate according to the Syracuse Real Estate Board's commission schedule. On March 1, 1952 Onondaga exchanged the Chimes Building for other property located in Atlanta, Georgia. Such exchange was procured by City Investing and no commission was paid to petitioners for this transaction. Onondaga redeemed at par the Preferred Stock owned by petitioners as follows: 336 shares *171 of First Preferred on January 20, 1948 28 shares of First Preferred on December 29, 1950 200 shares of First Preferred on July 18, 1951 288 shares of Second Preferred on July 18, 1951 On July 18, 1951, City Investing purchased from petitioners and charitable foundations established by them 100 shares of Onondaga Common Stock for $93,700. Salina redeemed at par the Preferred Stock owned by petitioners as follows: 236 shares on April 12, 1948 14 shares on November 29, 1950 On June 22, 1950, City Investing purchased from petitioners and two charitable foundations established by them 100 shares of Salina common stock for $12,700. In computing the capital gain on these redemptions and sales, petitioners used as their basis the price which they had paid for the stock. Upon an audit of the Eagan partnership's return for the year 1947, respondent made the following addition to the partnership's income: "(a) Commissions
$87,300.00
"The above adjustment represents the difference between the purchase price and what is considered to be full value of stock purchased from the City Investing Company, 25 Broad Street, New York, N. Y. and deemed to constitute *172 the commissions for services rendered by the partners. "Computation as follows: "Stock purchased
Onondaga Holding Corporation -
564 shares 1st Preferred - Cost
$17,500.00
Valued at
$56,400.00
288 shares 2nd Preferred - Cost
Valued at
28,800.00
100 shares Common - Cost
100.00
Valued at
100.00
Salina Holding Corporation -
250 shares Preferred - Cost
5,400.00
Valued at
25,000.00
100 shares Common - Cost
100.00
Valued at
100.00
Value of stock received - total
$110,400.00
Cost of stock
$23,100.00
23,100.00
Difference between cost and full value as above
$87,300.00"
Neither petitioner was ever an officer, director or employee of City Investing, Onondaga or Salina. Neither ever had any stock interest in City Investing nor any other stock interest in Onondaga or Salina other than as stated above. The transactions between City Investing and petitioners involving the shares of stock of Onondaga and Salina were in fact purchases of these shares by petitioners from City Investing, and City Investing sold the stock to petitioners to give them a proprietary interest in the two corporations and not to compensate them for any services *173 rendered or to be rendered. Opinion We make no finding as to the fair market value of the Onondaga and Salina stock. That would be material only if the excess, if any, of such value over the purchase price were determined to be taxable to petitioners as income in the year the stock was acquired. But not every "bargain purchase" is taxable income. Delbert B. Geeseman, 38 B.T.A. 258, Acq. 1939 - 1 C.B. 13; Norman G. Nicolson, 13 T.C. 690. And the circumstances here convince us that even if we were to decide that the value of the stock was above the price paid, its receipt was not equivalent to compensation, a dividend, or other taxable transaction. See James William Everhart, 26 B.T.A. 318; cf. Regulations 111, section 29.22(a)-1. Respondent does not suggest the resemblance to a dividend, and indeed that would be difficult in the case of petitioners who had not previously been stockholders of either parent or subsidiaries. He contends that the transfer was compensation for services. The difficulties with this are legion. No services were performed for which petitioners were not paid in full either at their customary rate [1] or *174 on the scale established by the Syracuse Real Estate Board. They were not bound to perform any services at all, except for the 30-day notice period required for cancellation of their management contracts. When they received the stock some services had already been performed and paid for. And future transactions, such as the mortgaging and sale of the properties, for all of which when the time came they were adequately compensated, could not well have been foreseen when the stock was transferred. If there were some other service contemplated, the burden was on respondent to suggest it. George W. Van Vorst, Executor, 22 B.T.A. 632, affd. (C.A. 9) 59 Fed. (2d) 677. Respondent's own witness gave the only reasonable explanation of the sale, at less than market if it was such, to two such outsiders as petitioners. This was the desire to enlist their financial interest because of the unique position they held in the local real estate field. Such a basis for a bargain purchase falls short of creating taxable income prior to the disposition of the subject matter of the purchase. *175 Delbert B. Geeseman, supra; Norman G. Nicolson, supra. In this respect we find the deficiency to have been erroneously determined. Decisions will be entered under Rule 50. Footnotes
1. Except where special circumstances reduced the scope of their required activities.↩